853 So.2d 1125 (2003)
Deborah RICE-LAMAR, Appellant,
v.
CITY OF FORT LAUDERDALE, a municipality, Appellee.
No. 4D01-1934.
District Court of Appeal of Florida, Fourth District.
September 17, 2003.
*1127 Reginald J. Clyne and Donnise A. Desouza of Clyne & Self, P.A., Coral Gables, for appellant.
Gordon D. Rogers and Kelly Cheary Sulzberger of Muller Mintz, P.A., Miami, for appellee.

ON MOTION FOR REHEARING AND/OR CLARIFICATION
SHAHOOD, J.
We deny appellee's motion for rehearing and grant the motion for clarification. We withdraw our previously issued opinion and substitute the following in its place.
This appeal arises from an action by Deborah Rice-Lamar (Lamar) against the City of Fort Lauderdale (City) pursuant to the Florida Whistleblower Act, section 112.3187, Florida Statutes (Supp.1996). Lamar alleged that she was fired from her position as the City's Affirmative Action Specialist because she attempted to express her opinion regarding the City's alleged discriminatory practices in the City's official affirmative action report to the City Commission. The trial court entered final summary judgment against Lamar and in favor of the City, based on collateral estoppel. Following the denial of her motion for reconsideration, she filed this appeal raising four issues.
This state-court action follows a prior action brought by Lamar against the City and her former supervisors in federal court. In that action, Lamar sought damages for violations of Title VII of the Civil Rights Act of 1964, as amended in 42 U.S.C. § 2000e, et. seq., 42 U.S.C. §§ 1981, 1983 and 1985, the First and Fourteenth Amendments to the United States Constitution, and various state claims, including a whistleblower claim pursuant to the Florida Whistleblower Act, section 112.3187, Florida Statutes (Supp. 1996). See Rice-Lamar v. City of Fort Lauderdale (Lamar I), 54 F.Supp.2d 1137, 1140 (S.D.Fla.1998), affirmed, Rice-Lamar v. City of Fort Lauderdale (Lamar II), 232 F.3d 836, 838 (11th Cir.2000). The facts and circumstances leading up to these two actions, many of which are set forth in the opinions of the federal district and circuit courts, are the following.

Facts
Lamar is an African-American female who was employed by the City as its Affirmative Action Specialist from June 20, 1988 through October 21, 1996. She was responsible for planning, directing and implementing a variety of internal equal employment opportunity and affirmative action programs within established policies and guidelines and recommending new policies and procedures. In addition, she was to advise departmental and personnel officials, as well as the City Manager, on potential Equal Employment Opportunity (EEO) liabilities, recommend strategies for achieving long-term affirmative action goals, and prepare annual affirmative action reports. Her work was to be reviewed by an administrative supervisor through conferences, periodic reports and observations of results achieved. Her supervisors *1128 were the City Manager, George Hanbury ("Hanbury"), the Assistant City Manager, Pete Witschen ("Witschen"), the Director of Administrative Services, Bruce Larkin ("Larkin"), and the Director of Personnel, John Panoch ("Panoch"). Her direct supervisor was Panoch.
Prior to January 1995, Lamar's employment record was unblemished and her performance was considered to be "above average." See Lamar I, 54 F.Supp.2d at 1140. Sometime during 1995, she prepared the City's official 1995 Affirmative Action Report which indicated that the City needed to take a new direction to end the systemic discrimination within the City government. See id. The report contained Lamar's own personal commentary and conclusions concerning the situation at the City. See id. According to Lamar, she was instructed by her supervisors to publish only the statistical numbers which, she claimed, concealed the City's discriminatory practices. See id.
On January 19, 1995, Lamar received a written reprimand from Panoch for, among other things, (1) failure to complete the 1995 Affirmative Action Report by the due date of December 2, 1994 and (2) failure to complete the Minority/Women's Business Enterprise Directory ("MBE/WBE Directory") for the City Commission, which was due December 22, 1994. Lamar was given until January 31, 1995 to complete both projects and later received a one-day suspension for failure to meet the second deadline. See id. Lamar did not appeal this disciplinary action. See id.
The deadline was revised a second time and extended to March 1995. Again, Lamar failed to meet the deadline. When she forwarded her final draft, in March 1995, the report still contained her personal narrative (regarding the correlation between high crime rate in the inner city and the failure to hire a sufficient number of police officers), which she had been directed to remove. A five-day suspension was recommended. Lamar appealed the recommendation, and the suspension was reduced to four days. She did not appeal this disciplinary action. See id. at 1140.
In February 1996, a City employee, Clifton McCree (McCree) shot several co-workers and committed suicide. He left a suicide note stating that his attack was to punish his former co-workers for the unfair and racist treatment he received. As a result of the shootings, the City hired Crisis Management International, Inc., to provide psychological services. During this time period, various meetings were held, which related to the shooting incident. Lamar was excluded from these meetings. In e-mails to Panoch, she took issue with the crisis management team's conclusion that racism did not appear to be an issue amongst the African-American employees interviewed following the fallout from the shooting. Lamar believed that the City was suppressing or denying the issue. Panoch advised Lamar that they would wait and see if the team advised them that racism was an issue, but, at that time, there was no evidence to support Lamar's personal views on the matter. Larkin, the Director of Administrative Services expressed displeasure at the fact that Lamar never completed her report for the last fiscal year and requested that she spend her time completing her specific assignments. Lamar was eventually told that it would be insubordination for her to speak to anyone without first directing her statements through Panoch and Larkin, her other immediate supervisor. See id.
On June 19, 1996, Lamar presented the 1996 Affirmative Action Report at the department head meeting. As with the 1995 Report, Lamar included her own commentary and conclusions in the Report. She commented, "we are still a City plagued *1129 with racism, glass ceilings for women and brick walls for people of color, a tolerance for the perceptions of unfairness and a proverbial silence about it all." See id. Lamar continued, "[h]owever, differences must first be acknowledged before either tolerated or valued. Recommendations on the City's diversity initiative are forthcoming; however, I will take this opportunity to foretell that they will acknowledge our need to address some basic problems of `ism' while moving toward an environment which values diversity and manages diversity for the betterment of all." Lamar II, 232 F.3d at 838.
All four of Lamar's supervisors expressed serious reservations about the content of the report and requested that she make various substantive changes before the report was delivered to the City Commission. See id. In particular, she was directed to remove the personal commentary and to draft a report which focused on the statistical data collected on minority and female representation in the City workplace. See id. Lamar refused to make most of the changes. See Lamar I, 54 F.Supp.2d at 1140; Lamar II, 232 F.3d at 838.
On July 22, 1996, Lamar delivered a revised copy of the 1996 report to Larkin and Panoch with a note that the report was ready for printing and distribution. On July 26, 1996, Larkin met with Lamar and offered her the opportunity to resign; she refused, stating that the report honestly and objectively outlined racial problems and tensions in the City. See Lamar II, 232 F.3d at 838. Three days later, Lamar distributed the revised version of the 1996 Affirmative Action Report, which had not yet been approved, to City Manager Hanbury and to all but one of the other department heads. She also distributed the MBE/WBE Directory. See Lamar I, 54 F.Supp.2d at 1141.
On August 5, 1996, Lamar responded to Larkin's request for her resignation, blaming the delay in producing the required reports on computer problems and also claiming that Larkin and Panoch were harassing her in an attempt to have her suppress her affirmative action analysis in her reports. See id. One week later, Lamar was notified of possible disciplinary action for incompetent performance based, among other things, on the delinquent and unauthorized distribution of the MBE/ WBE Directory and the unauthorized distribution of the revised 1996 Affirmative Action Report. The City Manager eventually approved the disciplinary action, which was to dismiss Lamar effective October 21, 1996.

Federal Court Proceedings
Approximately one year after she was terminated, Lamar filed a twelve-count federal action against the City and her former supervisors. See Lamar I, 54 F.Supp.2d at 1139. The essence of Lamar's complaint was that she was retaliated against for exercising her freedom of speech rights and was discriminated against based on race and gender when she attempted to express her personal opinion regarding the City's alleged discriminatory practices in the City's official 1995 Affirmative Action Report. See id. at 1140. The federal district court, sua sponte, declined to exercise its supplemental jurisdiction over the state claims and dismissed them, but the federal claims proceeded.[1]
Afer discovery and the filing of a joint pretrial stipulation, the district court granted final summary judgment in favor of the City and the four supervisors on all *1130 counts. See id. at 1140. On Lamar's First Amendment claim that she was retaliated against for expressing her free speech and that the City was systematically discriminating against its minority and women employees, the court held that while her expression did address matters of public concern, the manner in which she chose to make her views known was disruptive. See id. at 1144. The court noted that Lamar's allegations of protected activity related to her attempt to be a part of the crisis management meetings and to publish the Affirmative Action Reports she had prepared. See id. These meetings were internal meetings within the City and the Affirmative Action Reports were reports prepared by Lamar as an employee of the City and were the City's formal documents. Thus, while Lamar may have had a First Amendment right to make her opinions on racial discrimination known to the public, she was not entitled to do so in a report prepared for the City that would also represent the City's position. See id. The court found that Lamar's refusal to make changes to the report as requested by her supervisor constituted insubordination. See id.
As to her discrimination claims based on race and gender, the court held that Lamar was disciplined for refusing to follow her supervisors' instructions, and although the subject matter of the dispute between Lamar and her supervisors involved race and gender discrimination, the City's actions in terminating Lamar were not due to race or gender. Rather, they were due to her insistence on including her own conclusions in the Affirmative Action Reports against her supervisors' wishes. See id. at 1146. The court also held that the supervisors were entitled to qualified immunity on the claims asserted against them because Lamar's dismissal for insubordination was not unlawful. See id. at 1146-47. On appeal, the Eleventh Circuit affirmed the District Court. See Lamar II.

State Court Proceedings
Following the dismissal of her state claims from the federal action, Lamar refiled her claims, including her Florida whistleblower claim, in state court. In moving to dismiss her complaint, the City requested that all references to the McCree shooting be stricken as immaterial and irrelevant. The court granted the City's request to dismiss and strike, with leave to amend.
Lamar amended her complaint asserting only a public whistleblower claim, but again made references to the McCree shooting incident. On the City's second motion to strike, the court ordered Lamar to delete all references to the McCree incident, but allowed her to refer to the incident by date.[2] In her second amended complaint, Lamar again asserted a public whistleblower claim, and added claims for slander, libel and tortious interference. She alleged that she was reprimanded, suspended and discharged in retaliation for her attempts to publish the affirmative action reports, express her "professional" opinion regarding the February 1996 [McCree] incident and conduct an audit which would have revealed discriminatory employment practices.
During the pendency of the federal court appeal, the City filed its motion for summary judgment in the state action, arguing that Lamar was collaterally estopped by the federal district court decision from relitigating the reasons for her *1131 termination. The City relied upon the federal court's findings that Lamar was dismissed for legitimate, non-discriminatory reasons; that no causal connection existed between the alleged protected activity and the discharge; and that Lamar's memorandum to the City Manager was insufficient as a matter of law to constitute a protected disclosure under the Whistleblower Act. The state circuit court granted summary judgment based on collateral estoppel and the judgment entered by the federal district court in Lamar I. The final judgment was held in abeyance until Lamar's appeal to the Eleventh Circuit was resolved. Following the Eleventh Circuit's affirmance of the district court decision, the state circuit court entered final judgment against Lamar. This appeal now follows.

Analysis
Lamar maintains that her state whistleblower action is a separate and distinct cause of action from her federal discrimination claims; therefore, it was error to grant summary judgment based on the doctrine of collateral estoppel. Otherwise, she argues, the federal district court would not have declined to exercise supplemental jurisdiction and severed the state claims from the federal ones.[3]
Collateral estoppel, or issue preclusion, is a judicial doctrine which, in general terms, prevents identical parties from relitigating issues which have already been decided. See Dep't of Health and Rehabilitative Servs. v. B.J.M., 656 So.2d 906, 910 (Fla.1995)(citing Mobil Oil Corp. v. Shevin, 354 So.2d 372, 374 (Fla.1977)). The essential elements of the doctrine are that the parties and issues are identical, and the particular matter is fully litigated and determined in a contest which results in a final decision of a court of competent jurisdiction. See id. Courts have emphasized that collateral estoppel precludes relitigation of issues actually litigated in a prior proceeding. See id. Collateral estoppel does not require prior litigation of an entire claim, only a particular issue. See Club & Cmty. Consulting Corp. v. Brown, 728 So.2d 822, 823 (Fla. 4th DCA 1999).
In granting summary judgment in favor of the City based on collateral estoppel on Lamar's state court claim, the court relied upon the decisions rendered in Lamar I and Lamar II. This was error. The doctrine of collateral estoppel is not applicable because the issues litigated in the federal action were different from those presented in the state action. The issue of whether Lamar's discharge was in retaliation for her alleged disclosure of the City's allegedly discriminatory practices was not previously litigated and resolved in the federal action.
Florida's Whistleblower statute, section 112.3187(2), Florida Statutes, prevents agencies from taking retaliatory action against an employee who reports to an *1132 appropriate agency violations of law on the part of a public employer that create a substantial and specific danger to the public's health, safety, or welfare. The statute also prevents agencies from taking retaliatory action against any person who discloses information to an appropriate agency alleging improper use of governmental office, gross waste of funds, or any other abuse or gross neglect of duty on the part of an agency, public officer or employee. See id. The act is remedial in nature and should be construed liberally in favor of granting access to the remedy so as not to frustrate the legislative intent. See Irven v. Dep't of Health and Rehabilitative Servs., 790 So.2d 403, 406 (Fla.2001); Martin County v. Edenfield, 609 So.2d 27, 29 (Fla.1992).
In her federal action, Lamar filed discriminatory actions alleging that she was reprimanded, suspended and discharged based on her race and gender and that she was retaliated against because of her protected speech under the First Amendment. She did not raise a federal retaliation claim under Title VII. On the other hand, her state whistleblower claim is completely race and gender neutral. It is, therefore, separate and distinct from either her discrimination claim or her First Amendment protected speech claim. Although the facts giving rise to her claim are the same, the issues are entirely different.
Lamar's state whistleblower claim is based on her alleged reprimand and discharge as a result of her disclosure of a report which purportedly demonstrated that the City was in violation of various federal and state laws regarding its discriminatory employment practices towards minorities and women. As noted by the federal court, the elements necessary to support a claim under the Whistleblower statute are distinct from the elements necessary to support a Title VII discrimination action or a First Amendment protected speech claim. See Lamar I. As a result, the federal court's conclusion that Lamar was not terminated for discriminatory (race/gender related) reasons or for exercising her First Amendment right to free speech is not determinative of the issues relating to her state whistleblower claim. The fact that the federal court determined that she was terminated for insubordination is not determinative on whether she was retaliated against for her disclosure of alleged discriminatory practices by the City. Accordingly, summary judgment based on collateral estoppel was not proper.
Alternatively, the City argues that summary judgment was proper because there are no genuine issues of material fact.[4] The City relies upon the fact that the trial court adopted the findings of the federal court, which were based on Lamar's version of the facts and the facts contained in the Joint Pretrial Stipulation. As discussed above, however, the conclusions of the federal court pertain to separate and distinct claims and have no bearing on whether issues of fact exist with regard to Lamar's state whistleblower claim.
To establish a prima facie claim under Florida's Whistleblower statute, the requisite elements set forth under a Title VII retaliation claim are applied:
To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relation between the two events. We previously have noted that the causal link requirement under Title VII must be construed *1133 broadly; "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." Once the prima facie case is established, the employer must proffer a legitimate, non-retaliatory reason for the adverse employment action. The plaintiff bears the ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct.
Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir.1998) (citations omitted); see also Sierminski v. Transouth Fin. Corp., 216 F.3d 945, 950 (11th Cir.2000)(applying Title VII retaliation analysis to claim arising under private-sector Florida Whistleblower Act on a case of first impression).
The City argues that it is a question of law for the court to decide whether Lamar has met the disclosure requirements under section 112.3187. See Cummins v. Lake County Bd. of County Comm'rs, 671 So.2d 893 (Fla. 5th DCA), rev. denied, 678 So.2d 337 (Fla.1996)(affirming summary judgment in favor of employer on grounds that employee's internal communications did not rise to the level necessary to constitute a disclosure under section 112.3187(5) and that the Lake County personnel to whom employee expressed his concerns were not within the scope of persons to whom disclosure is protected under section 112.3187(6)). But this case presents mixed questions of law and fact.
Section 112.3187(5) provides that the information disclosed must include any violation or suspected violation of any federal, state or local law which creates and presents a substantial and specific danger to the public's health, safety or welfare or any act or suspected act of gross mismanagement, malfeasance, gross waste of public funds, or gross neglect of duty. Section 112.3187(6) directs that for disclosures concerning a local governmental entity, the information must be disclosed to a chief executive officer as defined in section 447.203(9) or other appropriate local official and section 112.3197(7) protects employees who disclose information on their own initiative in a written and signed complaint or employees who file any written complaint to their supervisory officials.
Both parties in this case dispute whether Lamar made the required disclosure, whether the disclosure was a protected disclosure, and whether she complied with the notice requirements of section 112.3187(6). Also, questions of fact remain as to whether Lamar's disclosure was made before or after she was disciplined and whether the action taken against her, would have been taken absent the disclosure. In addition, the City itself has taken inconsistent positions as to the basis for Lamar's termination. These issues would preclude summary judgment regardless of the collateral estoppel issues.
Next, we find no error in the trial court's order striking any reference to the McCree incident. While Lamar was prohibited from referring to the incident by name, she was allowed to allege in her second amended complaint that the February 1996 incident resulted, in large part, from the City's discriminatory practices and that the City allegedly attempted to exclude her from the crisis management meetings dealing with this incident.
Rule 1.140(f), Florida Rules of Civil Procedure permits "[a] party [to] move to strike ... redundant, immaterial, impertinent, or scandalous matter from any pleading at any time." "A motion to strike matter as redundant, immaterial or scandalous should only be granted if the material is wholly irrelevant, can have no bearing on the equities and no influence on the *1134 decision." See McWhirter, Reeves, McGothlin, Davidson, Rief & Bakas, P.A. v. Weiss, 704 So.2d 214, 216 (Fla. 2d DCA 1998)(quoting Pentecostal Holiness Church, Inc. v. Mauney, 270 So.2d 762, 769 (Fla. 4th DCA 1972)).
Lamar claims that the issues surrounding the McCree shootings were not wholly irrelevant to her whistleblower claim. Rather, she argues, the incident was direct evidence that the City's alleged discriminatory practices had a substantial impact on health and safety issues and amounts to gross mismanagement or gross neglect of duty. She claims that the incident was relevant to her claim because, in her opinion, it was an outgrowth of discriminatory employment practices. We do not agree, however, that Lamar has demonstrated a causal connection between the City's alleged discriminatory practices and the violent outburst by a former employee. More importantly, she has failed to show how the incident was related to her whistleblower claim that she was retaliated against based on her disclosure of information.
Finally, we hold that the trial court abused its discretion in granting the City's protective order and preventing Lamar from deposing the City's Mayor and Vice-Mayor. See generally Waite v. Wellington Boats, Inc., 459 So.2d 425, 426 (Fla. 1st DCA 1984)(a trial court's decision to grant, deny, or limit discovery is a matter of discretion which should be set aside only upon a showing of abuse). The Mayor advised that he would not be inconvenienced by having his deposition taken in this matter. See, e.g., Fla. R. Civ. P. 1.280(c)("for good cause shown, the court in which the action is pending may make any order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense that justice requires"). Further, since Lamar alleges that the Affirmative Action Report was prepared at the request of the Vice Mayor due to his and the Mayor's concerns about discrimination in the workplace, the positions of both of these officials are highly relevant to the whistleblower claim.
Accordingly, we reverse and remand the summary judgment order and remand for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
TAYLOR, J., and NELSON, DEBRA STEINBERG, Associate Judge, concur.
NOTES
[1] The Federal district court noted that Lamar's state claims presented novel and complex questions of state law which would predominate over the federal claims.
[2] Lamar filed a notice of voluntary dismissal against her four supervisors without prejudice.
[3] In the order dismissing Lamar's state claims without prejudice, the District court stated,

The Court notes that the Plaintiff, in her employment discrimination claims, alleges that she was subjected to discrimination based upon her race and gender. Conversely, the Plaintiff's state law claims are based in part on allegations that the Defendant was reprimanded, suspended and ultimately discharged by Plaintiff for attempting to reveal Defendant's discriminatory employment practices, and that the Defendants intentionally inflicted emotional distress upon the Plaintiff.
These state claims require completely different elements of proof wholly separate and distinct from the federal claims at issue. The Court finds that the state claims would tend to dominate the federal claims and obscure the significance of the federal claims. See Winn v. North American Philips Corp., 826 F.Supp. 1424, 1426 (S.D.Fla. 1993).
[4] The trial court did not reach this issue.