[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 9, 2011
JOHN LEY
CLERK

_____

No. 10-13434

_____

D.C. Docket No. 3:06-cv-00341-MMH-TEM

DEBRA TAYLOR JOHNSON,

                                                    Plaintiff - Appellant,

                            versus

STEIN MART, INC.,

                                                    Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(September 9, 2011)

Before EDMONDSON and PRYOR, Circuit Judges, and HOPKINS,* District
Judge.

---

    * Honorable Virginia Emerson Hopkins, United States District Judge for the Northern
District of Alabama, sitting by designation.

PER CURIAM:

In this second appeal, Debra Taylor Johnson ("Ms. Johnson") challenges the district court's grant, on remand, of summary judgment in favor of Stein Mart, Inc. ("Stein Mart") on her Sarbanes-Oxley Act ("SOX") and Florida Whistleblower Act ("FWA") retaliation claims. Ms. Johnson additionally appeals several collateral orders involving sur-reply, discovery, disqualification, and attorney name-clearing issues. Concluding that the record appropriately supports the district court's dismissal of Ms. Johnson's case on summary judgment, we affirm.[1]

## I. Background

## A. Facts[2]

Stein Mart is a publicly traded retail sales company. Ms. Johnson began working for Stein Mart's corporate headquarters in Jacksonville, Florida, on April 21, 2001, as a buyer for the boy's clothing department. In December 2002, Stein Mart promoted Ms. Johnson to be a buyer for the women's moderate petite department.

---

[1] We likewise find without merit Ms. Johnson's contention that the district court committed reversible error with respect to any of the aforementioned collateral orders.

[2] These are the facts for summary judgment purposes only. They may not be the actual facts. See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.'" (citation omitted)).

After this promotion, Ms. Johnson began complaining internally about certain of Stein Mart's business practices that she believed were inappropriate. Generally, Ms. Johnson's allegations fell into one of three categories: (1) improper collection of markdown allowances from vendors; (2) changing season codes on older inventory; and (3) inaccurate accounting of the value of inventory.

Ms. Johnson worked as a buyer for the women's moderate petite department until October 2003, when Stein Mart transferred her to the position of planner. While Ms. Johnson viewed this change in employment as a demotion, she retained the same pay, benefits, bonus calculations, and opportunities for advancement.

Ms. Johnson's duties as a planner included inventory-related responsibilities for the fragrance, watch, and bath and body departments. Ms. Johnson testified that she had "no[]" or "very little" discretion as a planner to determine the amounts of inventory that would be purchased or kept within the stores; it "was a [buyer]-driven decision . . . pretty much." However, Ms. Johnson also answered affirmatively when asked whether "a buyer would determine what product would be purchased . . . [and] . . . the planner would determine how much [of the product] has to be in a particular store and what the inventory needs to be," although Ms. Johnson "[did]n't fully understand how it all trickled into each other because [she] was not trained." Ms. Johnson received "very little, if any" training

3

as a planner.  She was not "formally trained;" she was "coached."  She "did a small class with Mark Agee."  Ms. Johnson's personal calendar entries show that training sessions occurred on November 3, 2003; February 12, 2004; February 26, 2004; May 6, 2004; May 20, 2004; and June 15 through 18, 2004, although she could not recall which ones she attended.

Ms. Johnson was responsible for the fall 2004 fragrance purchase plan, although she simply entered what Division Planning Manager Ginny McClaren ("Ms. McClaren") directed her to put in the system.  Ms. Johnson had no discretion about what data to enter, although she could voice her opinions.  Once the plan was entered, it was not touched again.  However, Ms. Johnson did not follow the Stein Mart fragrance forecast plan for fall 2004.  Instead, she made a decision that new fragrances were selling better than some of the old ones and funded the ones she thought would be more profitable.

In November 2004, a buyer named Jennifer Mauritz informed Ms. Johnson's supervisor, Ms. McClaren, that several store managers were reporting low inventories in fragrances.  Ms. McClaren and Ms. Johnson reviewed a recap of the fragrance purchases, prepared a new purchase plan, and ordered additional fragrances.  Ms. Johnson had not purchased those "exact fragrances" although the plan called for her to do so because "some of the new purchases that were written

4

on a manual purchase order would have performed like some of those like goods" that she did not order. Ms. Johnson testified that the "discrepancy as to that . . . came to about $384,000."

She received a written performance counseling on December 1, 2004, about the November fragrance inventory incident. Although Ms. Johnson personally disagreed that her actions contributed to the fragrance inventory problems, the counseling document made it clear that Ms. Johnson was expected to develop plans to better monitor purchasing.

Ms. Johnson then had a negative performance evaluation on February 11, 2005, which resulted in her receiving a "Final Warning" and being placed on a 90-day performance improvement plan, or risking further disciplinary action. During this 90-day time frame, Ms. Johnson was directed to meet with her supervisors at least every 30 days to review her performance as well as discuss ways for her to improve it. On March 15, 2005, and again on April 14, 2005, Ms. Johnson met with her then-current supervisor, Laurie Broeske, who informed her both times that her performance was not improving enough to retain her job.

On March 15, 2005, Ms. Johnson and her husband met with Jim Delfs ("Mr. Delfs"), Stein Mart's Chief Financial Officer, and told him about her prior complaints as well as her concern that she was being retaliated against for

reporting what she believed to be Stein Mart's unlawful business practices and for internally complaining about those practices. Mr. Delfs told Ms. Johnson he would look into her allegations.

With Ms. Johnson's consent, Mr. Delfs asked Joe Martinolich ("Mr. Martinolich") to conduct an investigation into Ms. Johnson's concerns. Mr. Martinolich did so. On May 10, 2005, he submitted his final report which set out his findings and his conclusion that there was no evidence to support Ms. Johnson's allegations of wrongdoing. Ultimately, on May 19, 2005, Stein Mart terminated Ms. Johnson's employment on the basis that she had not shown substantial improvement in the quality of her work after the issuance of her Final Warning in February.

## B. Procedural History

On May 23, 2005, Ms. Johnson filed a complaint against Stein Mart with the Occupational Safety and Health Administration ("OSHA").[3] In that complaint,

---

[3] Pursuant to 18 U.S.C. § 1514A(b), a person who alleges retaliatory discharge under SOX must first file a complaint with the Secretary of Labor. The Secretary of Labor has delegated to OSHA authority to administer such complaints. See 18 U.S.C. 1514A(b) (statutorily charging Secretary of Labor with enforcement of SOX claims); Secretary of Labor's Order No. 5–2002, 67 FR 65008-01, 67 FR 65008 (Oct. 22, 2002) (delegating authority to investigate SOX claims to OSHA); see also 29 C.F.R. § 1980.103(c) ("The complaint should be filed with the OSHA Area Director responsible for enforcement activities in the geographical area where the employee resides or was employed, but may be filed with any OSHA officer or employee."). On January 5, 2006, OSHA issued its determination of no violation.

she stated that she was discharged in retaliation for reporting fraudulent business practices that may have impacted Stein Mart's shareholders, in violation of SOX. Ms. Johnson filed this lawsuit on April 13, 2006. Stein Mart filed its first motion for summary judgment on March 15, 2007, which the district court granted on June 20, 2007.

Ms. Johnson appealed this initial summary judgment ruling to us. Because the district court did not address the status of the discovery documents filed under seal or Ms. Johnson's outstanding Rule 56(f) motion, on May 5, 2008, this Court vacated the summary judgment decision and remanded the case to allow the district court to complete the record. See Johnson v. Stein Mart, Inc., 276 Fed. App'x 931, 932 (11th Cir. 2008) (unpublished opinion).

Upon remand and after further development of the record, the district court reinstated the prior Rule 56 opinion entered in the case, and judgment was once again rendered in favor of Stein Mart. This second appeal followed on July 22, 2010.

## II. Standard of Review

"We review a district court's grant of summary judgment de novo, applying the same legal standards used by the district court." Kingsland v. City of Miami, 382 F.3d 1220, 1225 (11th Cir. 2004) (citation omitted). Summary judgment is

7

appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552 (1986) (setting forth summary judgment standard and clarifying that "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial").

A genuine factual dispute exists if "'a reasonable jury could return a verdict for the non-moving party.'" Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1358 (11th Cir. 1999) (quoting United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc)).  In examining the record, this Court views the evidence and "draw[s] all reasonable inferences in the light most favorable to the nonmoving party."  See Damon, 196 F.3d at 1358 (citation omitted).  Finally, "[i]f the movant bears the burden of proof on an issue, because, as a defendant, it is asserting an affirmative defense, it must establish that there is no genuine issue of material fact as to any element of that defense." International Stamp  Art, Inc. v. U.S. Postal Service, 456 F.3d 1270, 1275 (11th Cir. 2006) (citing Martin v. Alamo Community College Dist., 353 F.3d 409, 412 (5th Cir. 2003)).

8

## III. Analysis

## A. SOX Whistleblower Protection

## 1. Legal Framework

SOX's anti-retaliation whistleblower provision states in relevant part:

**(a) Whistleblower protection for employees of publicly traded companies.**--No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)) including any subsidiary or affiliate whose financial information is included in the consolidated financial statements of such company, or nationally recognized statistical rating organization (as defined in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c), or any officer, employee, contractor, subcontractor, or agent of such company or nationally recognized statistical rating organization, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee--

> **(1)** to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by . . .
>
> > **(C)** a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate

9

misconduct) . . . .

18 U.S.C. § 1514A(a)(1).

As for the type of reporting that SOX protects, the First Circuit has

observed:

> The plain language of SOX does not provide protection for any type
> of information provided by an employee but restricts the employee's
> protection to information only about certain types of conduct.  Those
> types of conduct fall into three broad categories: (1) a violation of
> specified federal criminal fraud statutes: 18 U.S.C. § 1341 (mail
> fraud), § 1343 (wire fraud), § 1344 (bank fraud), § 1348 (securities
> fraud); (2) a violation of any rule or regulation of the SEC; and/or (3)
> a violation of any provision of federal law relating to fraud against
> shareholders.  The first and third categories share a common
> denominator:  that the conduct involves "fraud," and many of the
> second category claims (violations of SEC rules or regulations) will
> also involve fraud.

Day v. Staples, Inc., 555 F.3d 42, 54-55 (1st Cir. 2009).

29 C.F.R. § 1980.104(b)(1) sets out the prima facie elements of a SOX

whistleblower claim:

> (i) the employee engaged in a protected activity or conduct; (ii) the
> [employer] knew or suspected, actually or constructively, that the
> employee engaged in the protected activity; (iii) the employee
> suffered an unfavorable personnel action; and (iv) the circumstances
> were sufficient to raise the inference that the protected activity was a
> contributing factor in the unfavorable action.

Id.; see also Gale v. U.S. Dept. of Labor, 384 Fed. App'x 926, 929 (11th Cir.

2010) (unpublished opinion) (same).

10

We recognize that SOX does not follow the familiar Title VII McDonnell Douglas burden-shifting framework. Rather, in a SOX retaliation case:

> [A]n employee bears the initial burden of making a prima facie showing of retaliatory discrimination; the burden then shifts to the employer to rebut the employee's prima facie case by demonstrating by clear and convincing evidence that the employer would have taken the same personnel action in the absence of the protected activity.

Welch v. Chao, 536 F.3d 269, 275 (4th Cir. 2008); see 18 U.S.C. § 1514A(b) ("An action brought under paragraph (1)(B) shall be governed by the legal burdens of proof set forth in section 42121(b) of title 49, United States Code."); 49 U.S.C. § 42121(b)(ii) ("[N]o investigation otherwise required under subparagraph (A) shall be conducted if the employer demonstrates, by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior."); see also Livingston v. Wyeth, Inc., 520 F.3d 344, 352-53 (4th Cir. 2008) (setting out SOX affirmative defense standard).

## 2. Application

Stein Mart disputes that Ms. Johnson has presented a SOX violation in connection with its treatment of her, including in particular its decision in May 2005 to discharge her from employment. Here, we assume without deciding that Ms. Johnson has satisfied her prima facie burden, including that her conduct was protected under SOX, and affirm the judgment below on the basis that Stein Mart

11

has affirmatively demonstrated, by clear and convincing evidence, that it would have terminated Ms. Johnson's employment in the absence of her protected conduct.[4]  See Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1256 (11th Cir. 2001) ("We need not decide whether the district court properly resolved [an] issue if there is another basis for affirming its judgment, because we may affirm its judgment 'on any ground that finds support in the record.'" (quoting Jaffke v. Dunham, 352 U.S. 280, 281, 77 S. Ct. 307, 308, 1 L. Ed. 2d 314 (1957)) (citing Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1286 (11th Cir. 1997))); see also Harp v. Charter Commc'ns, Inc., 558 F.3d 722, 726-27 (7th Cir. 2009) ("And if she met that [prima facie] burden, Charter could nonetheless prevail by establishing through clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of that protected behavior." (citations omitted)).

Proof of Stein Mart's clear and convincing non-retaliatory rationale for its termination of Ms. Johnson's employment centers upon her role in the mishandling of the company's fragrance purchases for the 2004 holiday season

---

[4]  We determine that none of Stein Mart's other complained-of actions were "unfavorable personnel actions" or otherwise violated the whistleblower provisions of SOX or the FWA. Compare 18 U.S.C. § 1514A(a) ("discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment"), with 29 C.F.R. § 1980.104(b)(1)(iii) ("unfavorable personnel action"), and Fla. Stat. § 448.102(3) ("retaliatory personnel action").

and her related subsequent failure to improve in her performance even after being counseled about her deficiencies, which we find to be amply corroborated. These reasons are bolstered by the absence of any competing evidence (beyond Ms. Johnson's personal views) that Stein Mart was incorrect in its assessment of her unsatisfactory performance as a planner. Cf. Moore v. Sears, Roebuck and Co., 683 F.2d 1321, 1323 n.4 (11th Cir. 1982) ("It is well settled in employment discrimination cases such as this that for an employer to prevail the jury need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant in good faith believed plaintiff's performance to be unsatisfactory . . . ." (citations omitted)); Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991) ("Federal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions.'" (quoting Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365 (7th Cir. 1988) (citations omitted))).

On appeal, one of Ms. Johnson's primary attacks of this defense is that the record does not substantiate that Stein Mart actually incurred any financial loss from the November 2004 fragrance inventory problems and that, because of this evidentiary gap, Stein Mart's reasons for discharging her are not credible and therefore the district court's decision cannot be upheld. We acknowledge that the

13

use of "expending" by the district court was perhaps not the best word choice for describing the November 2004 fragrance inventory problems because Stein Mart never claimed that Ms. Johnson was fired for causing the company to "lose" money. Nonetheless, even Ms. Johnson admits there was a "discrepancy . . . [of] about $384,000" between the fragrance purchase plan that she entered at Ms. McClaren's direction and what Ms. Johnson actually ordered and further admits that she deviated from the plan, without Ms. McClaren's approval or input, based on Ms. Johnson's own projection of sales. More specifically, some of Ms. Johnson's fragrance projections for 2004 were too high, while others were too low. Ms. Johnson further concedes that, in November 2004, she and Ms. McClaren ordered $384,587.95 of fragrances that were in addition to those Ms. Johnson had ordered, and that would have been ordered if Ms. Johnson had not substituted her projections and orders for those set out in the fall 2004 fragrance purchase plan.

Ms. Johnson's own opinion that she should not have been held accountable for this inventory "discrepancy," without more, does not create any material inconsistency in Stein Mart's insistence that she improve her performance or risk being fired. Cf. Holifield v. Reno, 115 F.3d 1555, 1556 (11th Cir. 1997) ("Thus, where the employer produces performance reviews and other documentary

14

evidence of misconduct and insubordination that demonstrate poor performance, an employee's assertions of his own good performance are insufficient to defeat summary judgment, in the absence of other evidence." (citation omitted)).  For example, Ms. Johnson offers no proof of other non-SOX-reporting planners who, despite having inventory discrepancies in areas assigned to them, were not counseled or placed on a performance improvement plan as she was.  Cf. Rice-Lamar v. City of Ft. Lauderdale, Fla., 232 F.3d 836, 843 (11th Cir. 2000) ("Rice-Lamar . . . has failed to present any evidence indicating that other insubordinate employees were treated more favorably." (citation omitted)).

Further, Stein Mart's decision to fire Ms. Johnson was not limited to the November 2004 fragrance inventory discrepancy.  Instead, the decision also was based on, and is strongly supported by, Ms. Johnson's abundantly demonstrated failure to substantially improve as a planner during her probationary period despite receiving multiple prior warnings explaining in detail how her work was not measuring up to Stein Mart's standards as well as participating in several meetings with her supervisor specifically designed to assist her in handling the position in a more satisfactory manner.  Ms. Johnson does not allege that her work improved during the probationary period.  Indeed, even at her deposition she insisted that "[she] wouldn't have made that [November 2004] additional purchase order."  Cf.

15

Rice-Lamar, 232 F.3d at 843 ("Rice-Lamar does not dispute that she refused to alter substantially the Affirmative Action Report . . . ." (citation omitted)).

Instead, Ms. Johnson insists that the probationary period was a sham. However, she has no evidence to that effect; all she offers are her unsubstantiated feelings. And again, Ms. Johnson has not pointed to any non-SOX reporting Stein Mart employee who was treated more favorably than she was despite having a similar pattern of unacceptable performance. Cf. Rice-Lamar, 232 F.3d at 843 ("Rice-Lamar . . . has failed to present any evidence indicating that other insubordinate employees were treated more favorably." (citation omitted)).[5]

Thus, while Ms. Johnson clearly does not think her performance could have improved no matter what she did and insists that Stein Mart's actions over the course of roughly twenty months (as measured from the time of her transfer to planner) constituted an elaborate cover-up to get rid of her for retaliatory reasons, she offers no corroborating proof to back up her beliefs and impressions. Cf. Holifield, 115 F.3d at 1565, supra. Indeed, when Ms. Johnson was interviewed on March 17, 2005, two days after her meeting with Mr. Delfs, by Mr. Martinolich

---

[5] In fact, Ms. Johnson repeatedly testified that other employees were treated similarly to her in ways that she felt were "hostile", e.g., Ms. McClaren was "that way [inappropriately intrusive about personal/medical leave] to other employees . . . [t]o some extent"; Barbara Hansen ("Ms. Hansen") forced Ms. Johnson to lower her own self-evaluation and also to lower her evaluation of Andy Andrews; and Ms. Hansen made inappropriate comments about Ms. Johnson and about other employees.

16

(who was investigating her complaint to Mr. Delfs), she told Mr. Martinolich that:

> [S]ome of the retaliation with this, [was] because . . . [her] salary was that of a buyer and not a planner. That some of it could have to do with what [her] salary was because [she] ha[d] a feeling [she] was probably making more than the average buyer because [she] was a buyer [and her salary remained the same when she was transferred to the planner position].

Further, the caliber of evidence presented by Stein Mart convincingly confirms that it would have dismissed her for performance-related deficits, regardless of any reporting on her part, and similarly means that a reasonable jury could not agree with Ms. Johnson's speculative retaliatory theory at trial. For example, one inference that a jury would have to draw in order to find in Ms. Johnson's favor is that Stein Mart's decision to place her on a three month plan for improvement rather than immediately dismissing her in February 2005 (i.e., the time when her Final Warning issued) was part of an overall plot to surreptitiously delay its already made retaliatory decision to discharge her for previously complaining about Stein Mart's retail practices. Such an inference simply is not reasonably supported based upon the evidence before us. See Harp, 558 F.3d at 728 ("The jury would have to conclude that in an effort to cover up the retaliatory action against Harp, Charter laid off the entire audit department as well as approximately 25 other individuals in other departments."); id. ("There is simply

17

no reasonable basis for a jury to believe what is ultimately mere speculation."); <u>see also</u> <u>Trimmer v. U.S. Dept. of Labor</u>, 174 F.3d 1098, 1104 (10th Cir. 1999) ("[Whistleblower provisions] are not, however, intended to be used by employees to shield themselves from the consequences of their own misconduct or failures." (citing <u>Kahn v. Secretary of Labor</u>, 64 F.3d 271, 279 (7th Cir. 1995))). Therefore, the district court committed no error in granting summary judgment for Stein Mart on Ms. Johnson's SOX claim due to Stein Mart's clear and convincing evidence that it would have discharged her for substandard performance reasons unrelated to her SOX-protected reporting.

## B. FWA Whistleblower Protection

Consistent with our analysis regarding the district court's dismissal of Ms. Johnson's SOX retaliatory discharge claim, we affirm the district court's dismissal of Ms. Johnson's FWA retaliation claim. The pertinent part of the FWA at issue in this appeal provides:

> An employer may not take any retaliatory personnel action against an employee because the employee has:
>
> > (3) Objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation.

Fla. Stat. § 448.102(3).

18

The parties disagree over whether § 448.102(3) of the FWA employs an actual violation standard or a reasonable belief of violation standard for private sector whistleblowing employees, such as Ms. Johnson. Moreover, the Supreme Court of Florida has not yet decided this issue of state statutory interpretation.

However, we do not find it necessary to reach this disputed statutory matter. See Lucas, 257 F.3d at 1256, supra. Instead, we assume without deciding that Ms. Johnson has established a prima facie case under the FWA consistent with the framework applicable in Title VII retaliation cases. See Sierminski v. Transouth Financial Corp., 216 F.3d 945, 950 (11th Cir. 2000) ("In the absence of any guiding case law [on FWA claims], the district court correctly applied the analysis used in Title VII retaliation cases."); see also Rice-Lamar v. City of Fort Lauderdale, 853 So. 2d 1125, 1132-33 (Fla. Dist. Ct. App. 2003) (setting out Title VII retaliation framework as applicable to FWA claims and citing Sierminski (other citation omitted)); Rice-Lamar, 853 So. 2d at 1133 ("Once the prima facie case is established, the employer must proffer a legitimate, non-retaliatory reason for the adverse . . . action." (citations omitted)); id. ("The plaintiff bears the ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct." (citations omitted)).

Based upon the facts already analyzed above under the SOX clear and convincing affirmative defense model, Stein Mart has articulated its legitimate non-retaliatory reason for firing Ms. Johnson, i.e., her failure to improve in performance as a planner despite several warnings to do so, and Ms. Johnson has not demonstrated pretext. Accordingly, we affirm the district court's dismissal of Ms. Johnson's FWA claim.

## IV. Conclusion

For the above-stated reasons, we affirm the district court's grant of summary judgment on Ms. Johnson's SOX and FWA claims.

**AFFIRMED.**

20